# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LOLONIE PURNELL obo G.B.,)
                   )    Case No. 11 C 8492
       Plaintiff,   )
   v.               )
                   )
MICHAEL J. ASTRUE,   )    Magistrate Judge Arlander Keys
Commissioner of Social )
Security,          )
                   )
       Defendant.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lolonie Purnell ("Ms. Purnell") seeks to obtain Supplemental Social Security Income ("SSI") on behalf of her minor son, G.B., under Title XVI of the Social Security Act 42 U.S.C. § 1382c(a)(3). The Commissioner of Social Security ("Commissioner" or "Defendant") denied the application for benefits at all levels of administrative review, prompting this appeal. The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and have now filed cross-motions for summary judgment.

Ms. Purnell raises several issues for review, including: 1) whether the Administrative Law Judge ("ALJ") erred in his finding that G.B. did not medically or functionally equal listing 103.03 B 2), whether the ALJ erred in failing to consider 103.03 C, and 3) whether the ALJ erred in finding a marked limitation in only one domain. For the reasons set forth below, the Commissioner's

motion for summary judgment is denied, and the case is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

## I. Procedural History

On August 14, 2009, Ms. Purnell applied for Supplemental Security Income ("SSI") disability benefits on behalf of her minor child, G.B., alleging disability beginning on July 1, 2009. (R. 17.) The claim was denied on October 7, 2009, and upon reconsideration on February 8, 2010. (*Id.*) Thereafter, Ms. Purnell filed a written request for hearing by an Administrative Law Judge ("ALJ"), which was held on February 23, 2011, in Chicago, Illinois. (*Id.*) At the hearing, Ms. Purnell and G.B. personally appeared, and Ms. Purnell testified. (R. 34-54.) G.B. was represented by counsel. (*Id.*)

A week later, on March 2, 2011, the ALJ denied Ms. Purnell's claim for benefits and found the minor child not disabled under the Social Security Act. (R. 29.) Then, on October 5, 2011, the Social Security Administration Appeals Council denied Ms. Purnell's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3.) The final decision of the Commissioner is reviewable by the District Court under 42 U.S.C. § 405(g).

## II.  G.B.'s History

G.B. was born on April 22, 2004.  (R. 124.)  At the time of the ALJ hearing, he was 6 years old and in first grade at Emmet Elementary School.  (R. 63-65, 158.)  G.B. lives with his biological mother, Ms. Purnell.  (R. 125.)  At the time of the hearing, G.B. had been prescribed Albuterol, Prednisone, and the use of a breathing machine (or "bronchodilator") to treat his asthma.  (R. 155-156.)  Ms. Purnell claims disability on behalf of G.B. because of his asthma beginning on July 1, 2009.  (R. 124.)

## III. Testimony, medical evidence, school records, and function report

### i. Ms. Purnell's Testimony

At the hearing, Ms. Purnell, G.B.'s mother, testified that G.B. has had asthma all his life.  (R. 42.)  She also testified to some of the medications G.B. has taken throughout the years. (R. 43.) Ms. Purnell explained that, at 2 years old, G.B. was prescribed albuterol.  (*Id*.)  Then, at 4 or 5 years old, he began taking the steroid, Prednisone.  (*Id*.) Ms. Purnell added that G.B. also uses a breathing machine.  (R. 43.)

Ms. Purnell explained the dosages of the medicines she gives G.B., which include prednisone once every two weeks, an inhaler

every day, and a breathing machine treatment every three days. (R. 48.)  Thereafter, Ms. Purnell stated that her grandmother replaces G.B.'s inhaler with her own prescription every two weeks.  (R. 48.)  Next, Ms. Purnell explained that her grandmother gets G.B. his other medicine too, unless Ms. Purnell gets prescriptions at the hospital.  (R. 47.)  Ms. Purnell testified that she does not take G.B. to monthly doctor checkups. (R. 47.)

Next, Ms. Purnell explained the activities that bring on G.B.'s attacks.  (R. 43, 53.)  From July 2009 on, activities like running, riding a bike, playing football or hide-and-go seek have triggered G.B.'s attacks.  (R. 45.)  Ms. Purnell added that it doesn't matter whether G.B. is inside or outside; he might have an attack.  (R. 45.)  Sometimes he has an attack for no apparent reason.  (R. 53.)

Ms. Purnell also testified that G.B. has attacks while sleeping.  (R. 44.)  She explained that G.B. has woken up, "crying, wheezing, bad like he couldn't breathe, he would lay across the bed and just cry, saying he can't breathe."  (R. 44.) Ms. Purnell testified that, during these times, she used to bring G.B. straight to the hospital. (R. 44.) Now, however, Ms. Purnell has a breathing machine and prednisone at home, so she gives G.B. those remedies first.  (R. 46-47.)  Then, if the treatments do

not work, she brings G.B. to the hospital.  (R. 46-47.)

Regarding G.B.'s at home breathing treatments, Ms. Purnell added that she sometimes gives G.B. two home breathing treatments before bringing him to the hospital.  (R. 50.)  Ms. Purnell explained that sometimes the second treatment helps and sometimes it does not.  (R. 50.)  Ms. Purnell stated that G.B. has not gotten any better.  (R. 47.)

Ms. Purnell finished her testimony by talking about the issues that G.B. has in school.  (R. 51.)  She explained that while in the 1st grade, G.B. had 12 absences - 9 excused and 3 unexcused.  (R. 51.)  Ms. Purnell said the absences directly result from "his breathment."  (R. 51.)  Sometimes Ms. Purnell said that she keeps G.B. home from school, and sometimes she has to pick him up from school because he is not feeling well.  (R. 51.)  Ms. Purnell explained that G.B.'s 1st grade attendance was better than it was in kindergarten.  (R. 51.)

Ms. Purnell added that G.B. sometimes has trouble completing his work, and the teacher will let him put his head down.  (R. 52.)  He also has trouble walking home from school.  (R. 52.)  Ms. Purnell closed by saying that, when G.B. has an attack on the way home from school, "[m]y cousin that he walk with have to put them – put him on his back and walk home."  (R. 52.)

## ii. *Medical Evidence*

The record contains two Social Security Administration childhood disability evaluations: (1) an October 1, 2009 evaluation by Victoria Dow, MD (R. 249-254); (2) and a February 8, 2010 evaluation by Cosme Cagas, MD (R. 305-310.)  Neither physician personally examined G.B.  (R. 249-254, 305-310.) Dr. Dow concluded that G.B. had a less than marked limitation in health and well-being and no limitations in any other domain. (R. 250-254.)  Explaining her findings, Dr. Dow said that G.B. had been to the emergency room in March, June, and September of 2009, that he received treatments, and was discharged in stable condition.  (R. 254.)  Dr. Dow also stated that, based on G.B.'s school records, G.B., "does not frequently miss school due to illness, and his ability to function is not affected by his asthma."  (R. 252, 254.)  Finally, Dr. Dow found Ms. Purnell to be "partially credible."  (R. 254.)

Dr. Cagas disagreed with Dr. Dow's determination, and instead concluded that G.B. had a marked limitation in health and well-being and a less than marked limitation in moving about and manipulating objects.  (R. 308.)  Explaining his findings on health and well-being, Dr. Cagas said that G.B. had been to the

emergency room six times[1] in 2009 for exacerbations relating to asthma. (*Id.*) Dr. Cagas added that G.B. was not on continuous steroids, nor did he have "severe complications" in school because of his condition. (*Id.*)

Regarding the limitation on moving and manipulating, Dr. Cagas stated that G.B. is, "able to move about as long as does not over-exert self or expose self to respiratory irritants. (R. 308.) Dr. Cagas did not indicate which sources he used in his evaluation.

The record also contains a number of reports and progress notes from G.B.'s visits to the emergency room. Between July 25, 2008 and February 4, 2010, there were eight documented hospital visits – two in 2008, five in 2009, and one in 2010.

G.B.'s first two emergency room visits were for July 25 and July 26, 2008. (R. 277, 279.) On both days, 4-year old G.B. complained of cough, shortness of breath, and wheezing and was admitted to West Suburban Medical Center ("West Suburban"). (R. 277, 279.) During those days, G.B. was diagnosed with asthma exacerbation and received treatments including a nebulizer, Albuterol inhaler, Xopenex nebulizer Atrovent, Prelone (in which Prednisone is the active ingredient), and Sodium Chloride. (R.

---

[1] Dr. Cagas mentions an 8/10/2009 hospital visit that the Court could not find anywhere in the record. During the merits hearing, counsel admitted, "that must have been a mistake" with regard to that date (R. 38); therefore, the Court assumes that G.B. has five documented visits.

279, 283, 284.)  G.B.'s chest x-ray was negative for acute
cardiopulmonary disease; lungs were clear. (R. 285.)  When G.B.
was finally discharged, he was given an Albuterol Inhaler,
Flovent Inhalor, and Prednisone, the steroid.  (R. 275.)
On March 2, 2009, G.B. visited West Suburban's emergency room for
a third time.  (R. 234.)  There, he showed signs of rales, cough,
shortness of breath, and wheezing.  (R. 217, 237, 238.)  G.B.'s
chest x-ray was negative for cardio-pulmonary disease, but
positive for viral bronchitis.  (R. 230.)  While at the hospital,
G.B. received treatments including a nebulizer, Albuterol
inhaler, Xopenex nebulizer Atrovent, and Prelone. (R. 238, 236.)

     June 10, 2009 was G.B.'s fourth emergency room visit at
West Suburban.  (R. 226.)  In addition to his usual complaints of
cough, shortness of breath, and wheezing, G.B. also had abdominal
pain, fever, and diarrhea.  (R. 226-233.)  He was diagnosed with
acute asthma, bronchitis, and mild tachypnea.  (R. 226, 228,
229.)  G.B. was given the same treatment he received during his
previous visits, including a nebulizer, Albuterol inhaler,
Xopenex nebulizer Atrovent, and Prednisone.  (R. 228.)  Hospital
notes indicate that G.B.'s mother tried a nebulizer treatment at
home, but was unsuccessful in treating G.B.'s asthma. (R. 231.)

     On September 7, 2009, G.B. visited West Suburban's
emergency room for a fifth time.  (R. 222.)  Like on July 10,

8

2009, G.B. presented with symptoms of cough, shortness of breath, and wheezing. (R. 222.) He was diagnosed with acute asthma and treated with Xopenex and Prelone. (R. 220-223.) Once again, hospital notes indicate that G.B.'s mother tried a nebulizer treatment at home, but was unsuccessful at quelling G.B.'s symptoms. (R. 225.)

November 9, 2009 was G.B.'s sixth visit to West Suburban. (R. 266.) Again, he presented with symptoms of cough, shortness of breath, and wheezing. (R. 266, 269, 271.) G.B. also showed signs of retractions, fever, and abdominal pain. (*Id.*) G.B. was diagnosed with acute asthma and treated with Albuterol, Atrovent, and Prelone. (R. 273, 267.)

November 28, 2009 was G.B.'s seventh visit to West Suburban. (R. 258.) Again, he presented with symptoms of cough, shortness of breath, and wheezing. (R. 258, 259, 262.) Again, G.B. was diagnosed with acute asthma and treated with Albuterol, Atrovent, and Prelone. (R. 258, 263.) G.B.'s chest x-ray was negative for acute cardiopulmonary disease; lungs were clear. (*Id.*)

On February 4, 2010, G.B. visited West Suburban for an eighth time. (R. 296.) However, this time, he was admitted for abdominal pain, cramping, and vomiting. (R. 296.) Zofran, a nausea prevention medicine, was administered. (R. 298.) G.B.

did not present with symptoms of cough, shortness of breath, or wheezing. (*Id.*) G.B was discharged in stable condition. (R. 298.)

### iii. *School Records*

The school record includes one teacher assessment and one progress report. (R. 164, 243.) The first record is a teacher assessment completed by Ms. Cheryl Hill, G.B.'s kindergarten teacher. (R. 164-170.) In the assessment, Ms. Hill concluded that G.B. had no limitations in any of the six domains of functioning and that G.B. did not frequently miss school because of his asthma. (*Id.*) Ms. Hill provided these conclusions thirty days after she met G.B. (*Id.*) The second record is a progress report that was submitted by the school counselor, Ms. Greens. (R. 243-44.) It covers G.B.'s pre-kindergarten/kindergarten year; it states only that G.B. is "well-developed." (*Id.*)

### iv. Function Report

On August 18, 2009, in anticipation of filing an application for SSI, G.B's mother, Ms. Purnell, completed a "Function Report-Child Age 3 to 6th Birthday" on behalf of G.B. (R. 142.) Ms. Purnell reported that G.B.'s asthma sometimes limits his physical abilities. (R. 147.)

According to Ms. Purnell, "asthma seems to bother [G.B.]

about three times every day.  If he does something physical, he will definitely have an attack, but often he even has an attack when he is sleeping." (R. 147.)  Moreover, Ms. Purnell added, "[G.B.] can have an asthma attack regardless of weather conditions or activity level." (R. 149.)  G.B.'s report also explains that G.B. takes albuterol and prednisone.  (R. 155.)

## IV. ALJ Decision

During G.B.'s hearing, the ALJ made two overall conclusions. (R. 41, 53.)  Towards the beginning of the hearing, the ALJ stated, "Well [G.B.] definitely has at least a marked limitation… and in the sixth domain if you will, the health and physical well-being if not more than marked." (R. 41.)

At the end of the proceeding, the ALJ stated, "I don't know if he meets the listing in terms of the frequency of the ER visits because we're just a little bit short but I'm going to look at the rest of the listing and make an analysis based on the other issues, you know, surrounding his breathing problems." (R. 53.)

The ALJ issued his decision on March 2, 2011, finding that G.B. had not been under a disability within the meaning of the Social Security Act from July 1, 2009 through the date of his decision.  (R. 17).  The ALJ applied the three-step sequential

analysis as required by the Act, under 20 C.F.R. 416.924(a).

At step one, the ALJ found that G.B. had never engaged in substantial gainful activity.  (R. 20.)  At step two, the ALJ determined that G.B. had a severe impairment of asthma.  (R. 20.) At step three, the ALJ made two conclusions.

First, he concluded that G.B. does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments from 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925, or 416.926).  (R. 20.)

Second, the ALJ concluded that G.B. does not have an impairment or combination of impairments that functionally equals the listings.  (R. 21).  This opinion focuses on part C of the asthma listing 103.03 and the functionality domains that are in dispute.

Regarding G.B.'s ability to meet or equal the listed impairments, the ALJ focused on part B of the asthma listing at 103.03.  (R. 20.)  The ALJ stated that G.B.'s chest x-rays showed clear to mild findings in his lungs, that G.B. lacked the requisite number of hospital visits, and that G.B.'s breathing problems do not affect his ability to perform in school.  (R. 20-23.)

Regarding G.B.'s ability to functionally equal the listings,

the ALJ gave "significant weight" to the opinions of the non-examining state agency physicians and some weight to Ms. Purnell's testimony, which he characterized as "generally credible." (R. 22.) In considering the six functional domains, the ALJ found that G.B. had a "less than marked" limitation in moving about and manipulating objects, a "marked" limitation in health and physical well-being, and no limitation in any remaining domains.[1] (R. 23-25, 27.) Thus, the ALJ determined a finding of "not disabled" appropriate under the framework of the above-cited rules, and that G.B. was not entitled to benefits. (R. 27.)

## STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether the claimant is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir.2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.2007). The court's task is to

---

[1] interacting and relating with others, attending and completing tasks, or caring for one's self

determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir.2007) (quoting *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004)).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue,* 573 F.3d 503, 513 (7th Cir.2009) (quoting *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir.2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir.2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir.2002)).

## STANDARD FOR CHILD SSI BENEFITS

A child is disabled within the meaning of the Social Security Act if he or she has a "physical or mental impairment, which results in marked and severe functional limitations, and which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). In determining whether a child meets this

definition, the ALJ engages in a three-step analysis: (1) if the child is engaged in substantial gainful activity, then his claim is denied; (2) if the child does not suffer from a severe impairment or combination of impairments, then his claim is denied; and (3) the child's impairments must meet, medically equal, or be functionally equal to any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1. 20 C.F.R. § 416.924(b)-(d); *see also Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir.2007).

To determine whether an impairment functionally equals a listing, the ALJ must assess its severity in six age-appropriate categories: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Each domain describes what a child should be able to do throughout five age categories: (1) "newborns and young infants" (birth to age 1); (2) "older infants and toddlers" (age 1 to age 3); (3) "preschool children" (age 3 to age 6, including children in kindergarten but not first grade); (4) "school-age children" (age 6 to age 12, including children in first grade through

middle school); and (5) "adolescents" (age 12 to age 18). 20
C.F.R. § 416.926a(g)(2), (h)(2), (i)(2), (j)(2), (k)(2), (l)(2).

An impairment functionally equals a listing if it results in
"marked" limitations in two domains of functioning, or an
"extreme" limitation in one domain.  The functional equivalence
analysis requires the ALJ to consider how the child functions as
a whole.  "[T]his consists of looking at all of the child's
activities, which include everything the child does at home, at
school, and in her community, and evaluating how the child is
limited or restricted in those activities, without cabining the
child's impairments into any particular domain." *Bielefeldt ex
rel. Wheelock,* No. 09 C 50302, 2011 WL 3360013, at *4 (N.D.Ill.
Aug.4, 2011) (citing 20 C.F.R. § 416.926a(b)-(c)).

### ANALYSIS

Ms. Purnell argues that the ALJ's decision must be reversed
because the ALJ erred in his analysis.  First, she argues that
the ALJ failed to properly analyze whether G.B. medically equaled
the listing for 103.03(B).  Second, Ms. Purnell argues that the
ALJ erred in failing to consider listing 103.03(C).  Third, Ms.
Purnell argues that the ALJ erred in finding a marked limitation
in only one domain.  The Court will address each issue in turn.

**I. The ALJ failed to properly analyze listing 103.03(C).**

First, Ms. Purnell argues that the ALJ failed to evaluate whether G.B. met or equaled the listing requirements of 103.03(C) ("part C"). Conversely, the Commissioner contends that the ALJ clearly cited and addressed 103.03(C). (Def.'s Br. 6.) The Court agrees that the Commissioner cited 103.03, but disagrees that the ALJ fully analyzed or cited part C of 103.03.

Social Security Regulation C.F.R. § 416.924 provides that a child's impairment(s) must meet, medically equal or functionally equal a listing in order for the child to be found disabled. 20 C.F.R. 416.924(d). Listing 103.03 states that a child meets the listing for asthma if he or she has asthma and:

A) $FEV_1$ equal to or less than the value specified in table I of 103.02A; Or
B) Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks; Or
C) Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:
   1) Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
   2) Short courses of corticosteroids that average more than

5 days per month for at least 3 months during a
                    12-month period; Or
    D) Growth impairment as described under the criteria in 100.00.

Listing 103.03, 20 C.F.R. Pt. 404, Subpt. P, App. 1

    In the ALJ's discussions of whether G.B. meets or equals

listing 103.03, the ALJ did not confront the evidence in light of

103.03(C).  (R. 22-28.)

    In the ALJ's section on meeting the listing, the ALJ cited

listing 103.03 in its entirety, but mentioned only one piece of

evidence that applied to an element in part C.  (R. 21-22.)  The

evidence mentioned was G.B.´s clear to mild results on his x-

rays.  (*Id.*)  Although the ALJ did not discuss it, these x-rays

fail to meet a sub-element of part C,[2] but are not required to

satisfy part C. After stating the fact of G.B.'s clear to mild x-

rays, the ALJ seems to ignore the rest of part C, and stated his

conclusion that G.B. did not meet listing 103.03.  (R. 21-22.)

    Then, in the ALJ's section on equaling the listing, he

mentioned two other pieces of evidence that apply to part C,

G.B.'s breathing machine ("bronchodilator") and his reliance on

prednisone ("corticosteroid").  (R. 21-23.)  A child's use of a

bronchodilator and a certain amount of corticosteroids can

satisfy 103.03(C), but the ALJ did not provide evidence of his

_____
[2] 103.03(C)(1)"radiographic or other appropriate imaging techniques evidence of
pulmonary hyperinflation or peribronchial disease"

18

consideration of whether G.B.'s use of these medications equaled the elements in listing 103.03(C). (R. 21-28.) First, although the ALJ considered that Ms. Purnell was not giving G.B. prednisone in 2009 (R. 22-23; R. 44), the ALJ failed to explain whether G.B. was taking any corticosteroids during the rest of the relevant disability period from January 2010 to July 2010. (R. 22-28.) Second, the ALJ failed to provide evidence of his consideration regarding the amount of corticosteroids given to G.B. during his hospital emergency room visits and in the aftermath of each hospital visit during the disability period in 2009. (*Id.*) Third, the ALJ failed to explore whether Ms. Purnell was administering bronchodilator treatments during the alleged disability period. (*Id.*)

Based on a review of the record on its face, the ALJ's assessment of part C was incomplete. Ms. Purnell testified, and medical records confirmed, that G.B. had persistent wheezing and attacks during the day and night, which required Ms. Purnell to treat G.B. with a bronchodilator. (R. 49-53; R. 225, 231.) Medical evidence also shows that G.B. was receiving dosages of steroids both in the hospital emergency rooms and in the aftermath of each hospital visit. (R. 220, 227, 235, 267; *See* Pl.'s Br. 5.)

While the determination of whether the evidence in the record meets or medically equals the requirements of the listing is the ALJ's to make, his failure to consider evidence in light of the unmentioned subsections of listing 103.03 suggests that his determination was incomplete. Remand is necessary to remedy this inadequacy. *See Ribaudo v. Barnhard,* 458 F.3d 580, 583 (7th Cir.2006)(finding that remand is required where the ALJ did not provide a sufficient analysis of the Step 3 question since he failed to mention the applicable listing and failed to evaluate evidence favorable to the plaintiff) *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir.2003)(finding that the ALJ's failure to discuss the claimant's impairments in conjunction with the listings "frustrate[d] any attempt at judicial review.") *Scott v. Barnhart,* 297 F3d 589, 595 (7th Cir.2002)(failure to discuss or reference a listing left the Court "with grave reservations as to whether the factual assessment adequately addressed the criteria of the listing.").

**II. The Court need not determine whether the ALJ properly analyzed the evidence of listing 103.03(B), nor whether the ALJ erred in finding a marked limitation in only one domain.**

Ms. Purnell concedes that G.B. technically does not meet the listing for 103.03(B), but argues that the ALJ was too rigid in

his analysis as to whether G.B. equaled listing 103.03(B). (Pl. Br. 1-3.) She also argues that the Commissioner conflated the analysis for meeting and medically equaling a listing. (Pl.'s Rep. Br. 3.) Conversely, the Commissioner argues that the ALJ correctly analyzed whether G.B. met or equaled listing 103.03(B).

In light of the Court's decision to remand based on the ALJ's incomplete analysis of 103.03(C), there is no need to determine whether the ALJ based his decision on substantial evidence with regard to listing 103.03(B). However, the ALJ may want to more closely consider the evidence presented in light of the arguments presented by both parties.

Finally, Ms. Purnell contends that the ALJ unreasonably concluded that G.B. was not markedly limited in his ability to move and manipulate objects or attend to and complete tasks. (Pl. Br. 15.). She also contends that no medical expert reviewed G.B.'s February 4, 2010 hospital visit, as Dr. Cagas' report was submitted on that same day. (Pl. Rep. Br. 3.) Conversely, the Commissioner argues that the ALJ's determinations of G.B.'s functional domains were reasonable.

Again, due to the Court's decision to remand based on an incomplete analysis of 103.03, the Court will not embark further in an effort to determine whether the ALJ's conclusion of one

marked limitation and one less than marked limitation rests on substantial evidence. Nonetheless, the Court would suggest that the ALJ revisit the evidence presented on this point in light of the arguments presented by both parties.

**III. Conclusion**

For the reasons set forth above, the Commissioner's motion for summary judgment is denied, Plaintiff's motion is granted, and the matter is remanded for further proceedings consistent with this opinion.

Dated: April 12, 2013

ENTER:

ARLANDER KEYS
United States Magistrate Judge